RYOJI YOSHINO, Claimant-Appellee, *v.* SAGA FOOD SERVICE AND JOHN MULLEN AND COMPANY, Employer, Insurance Carrier-Appellant, And MID-PACIFIC INSTITUTE AND FIRST INSURANCE COMPANY OF HAWAII, Employer, Insurance Carrier-Appellee

NO. 6024

APRIL 19, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY OGATA, J.

Saga Food Service (Saga) and its insurer, John Mullen and Company (Mullen), appeal from a decision rendered by the Labor and Industrial Relations Appeals Board (Board). The Board's decision, which affirmed an earlier decision of the Director of Labor and Industrial Relations, awarded workers' compensation benefits to Claimant Ryoji Yoshino (Yoshino), with payment of such benefits being assessed entirely against Saga and Mullen. No liability for workers' compensation benefits was assessed by the Board against Mid-Pacific Institute (Mid-Pacific) and its insurer, First Insurance Company of Hawaii.

Saga's contention is that Mid-Pacific and Saga were joint employers of Yoshino, and, as a result, Mid-Pacific should be required to share with Saga any liability for workers' compensation benefits awarded to Yoshino. We are of the view that under the provisions of HRS § 386-1 (1976 Repl.), Saga was the sole employer of Yoshino, and Saga was thus liable for the full measure of workers' compensation benefits awarded to Yoshino. Hence, we affirm the decision and order of the Board.

There is no dispute as to the facts. The Mid-Pacific Institute is a private educational institution located in Honolulu. In conjunction with its educational programs, Mid-Pacific has provided room and board for its students. Yoshino was employed as a chef by Mid-Pacific from 1947 until July, 1971.

Beginning July 1, 1971, Saga began to operate the Institute's food service, which had theretofore been operated entirely by Mid-Pacific. A written agreement between Mid-Pacific and Saga, which was dated July 1, 1972, regarding Saga's operation of the food service was in effect at the time that Yoshino's injury occurred in 1973.

The termination by Mid-Pacific of its own operation of the food service would ordinarily have necessitated Yoshino's release from employment by Mid-Pacific. However, rather than terminate Yoshino's employment, Mid-Pacific reached an agreement with Saga whereby Yoshino would remain as a chef in the food service operation to be run by Saga. Pursuant to that agreement, Yoshino remained on the Mid-Pacific payroll, although Saga reimbursed Mid-Pacific for the wages and benefits paid by Mid-Pacific to Yoshino.[1] This arrangement enabled Yoshino to continue to be eligible for retirement benefits from Mid-Pacific. These benefits would have otherwise been lost to Yoshino if Mid-Pacific had released him from its payroll. It was for the sole purpose of preserving Yoshino's eligibility for retirement benefits that this employment arrangement was negotiated between Mid-Pacific and Saga.

Therefore, from July 1, 1971, until the time of his industrial accident, Yoshino continued in his capacity as Head Chef at the Mid-Pacific Institute food service facility under the management supervision of Saga. As Head Chef, Yoshino supervised other food service employees and was responsible

---

[1] The addendum to the agreement contains this provision:

12. The Institute shall retain on its payroll Ryoji Yoshino and David Nekotani. The amounts for wages and benefits paid to Messrs. Yoshino and Nekotani shall be reimbursed to the Institute by Saga.

Mid-Pacific continued to also provide free lodging for Yoshino on the grounds of the Institute. However, Mid-Pacific was not reimbursed by Saga for the cost of this housing.

Under the agreement, Mid-Pacific furnished Saga with kitchen and office facilities and all related equipment, as well as equipment maintenance and building repair services.

for the timely and satisfactory completion of food preparation. Yoshino was immediately responsible, however, to a Food Service Director employed by Saga at the Mid-Pacific facility.

Saga thus arranged all menus, ordered all food supplies, and gave Yoshino full instructions regarding menu preparation. In addition, Saga prescribed other details of Yoshino's employment, such as hours of duty, break periods, vacation schedule, overtime employment, days off, and other rules regarding conduct at work. It also furnished uniforms to Yoshino and bore the expense of laundering those uniforms. However, Saga was understood to have been required to consult with Mid-Pacific in the event that any disciplinary action, change in wage or fringe benefits, or termination of employment was contemplated by Saga with respect to Yoshino.

Yoshino worked for Saga for approximately ten-and-a-half months out of the year. This period coincided with the regular nine-month school year plus approximately one-half of the summer period. For the remaining one-half of the summer period, Yoshino was employed exclusively by Mid-Pacific, which operated the food service facility during that period in conjunction with summer conferences and similar events.

Besides preparing food for Mid-Pacific Institute, Saga also utilized the Mid-Pacific food service facility to prepare food on a regular basis for three other schools in the area. Saga then turned over to Mid-Pacific a portion of the income from these three other schools as compensation for Saga's use of the Mid-Pacific facility.

Yoshino was injured on February 25, 1973, while moving a metal rack containing a large number of pies. He was pushing the rack into a freezer when he twisted his back and neck. None of the parties disputes the fact that Yoshino's injuries arose out of and in the course of his employment and are thus compensable under our Workers' Compensation Law.[2] *See*

---

[2] Previously titled *Workmen's* Compensation Law. See 1975 Haw. Sess. Laws, c. 41 § 1.

HRS § 386-3 (1976 Repl.).

Saga concedes that it is responsible for at least a portion of the workers' compensation benefits payable to Yoshino. However, it argues that the Board erred in assessing full liability for those benefits upon Saga and its insurer, Mullen. The sole controversy, therefore, is whether Saga alone, or whether both Saga and Mid-Pacific, will be held liable for the workers' compensation benefits payable to Yoshino.

In reaching its decision, the Board utilized two general tests for determining whether more than one employer is liable for workers' compensation benefits. One test was referred to as the "relative nature of the work test", which involves a balancing of factors regarding the general relationships which the employee has with regard to the work performed for each of his employers. The other test, called the "control test", looks to the degree of control exercised by each employer with regard to the employee. Although the Board utilized both of these tests in reaching its decision, it stated a clear preference for the relative nature of the work test.

While we agree with the result reached by the Board in finding Saga solely responsible for Yoshino's workers' compensation benefits, we must disapprove of the Board's primary emphasis upon the relative nature of the work test. Our decision in *Kepa v. Hawaii Welding Co.*, 56 Haw. 544, 545 P.2d 687 (1976), which we acknowledge was decided subsequent to the Board's decision in the instant case, made clear that the control test is the primary guideline for determining whether an employer is a special employer for workers' compensation purposes. As we stated in *Kepa:*

> The paramount consideration in determining whether the alleged special employer is in fact a special employer of the worker in workmen's compensation lent employee cases is whether the alleged special employer exercised control over the details of the work of the loaned employee and such control strongly supports the inference that a special employment exists.

*Id.* at 548, 545 P.2d at 691.

The present case certainly falls within the ambit of the "lent employee" provisions of HRS § 386-1 (1976 Repl.),[3] and the *Kepa* rule stated above is thus applicable here. It is clear that Mid-Pacific was Yoshino's "original employer" at the time that the injury occurred. Mid-Pacific had retained Yoshino on its payroll and exclusively employed him itself for one-half of the summer months. As such, Yoshino, never really left the general employ of Mid-Pacific when Saga assumed responsibility of the operation of the food service. It is apparent, however, that Yoshino was "loaned or hired out" to Saga by Mid-Pacific commencing July 1, 1971, for a period to last approximately ten-and-a-half months of each calendar year. Mid-Pacific continued to directly pay Yoshino his wages and other benefits, but Saga reimbursed Mid-Pacific in full for these amounts. Therefore, the instant situation represents a classic example of the "lent employee" case, for it begins with an already existing employment relationship, and the resultant conflict does not center around employee and employer but instead throws two employers, along with their insurance carriers, against each other. 1A A. Larson, Workmen's Compensation Law § 48.10 (1973).

Under HRS § 386-1 (1976 Repl.), when an employee is loaned or hired out to another employer, the employee may be regarded as an exclusive employee of that other employer for purposes of workers' compensation benefits, notwithstanding the fact that the employee continues to be paid directly by his original employer. *See* n. 3, *supra*. Thus, the fact that

---

[3] The pertinent portion of HRS § 386-1 (1976 Repl.) provides as follows:

"Employee" means any individual in the employment of another person.

Where an employee is loaned or hired out to another person for the purpose of furthering the other person's trade, business, occupation, or profession, the employee shall, beginning with the time when the control of the employee is transferred to the other person and continuing until the control is returned to the original employer, be deemed to be the employee of the other person regardless of whether he is paid directly by the other person or by the original employer. . . .

Mid-Pacific retained Yoshino on its direct payroll is irrelevant for purposes of HRS § 386-1 (1976 Repl.).

However, before Saga can be held responsible for the loaned employee's workers' compensation benefits, two additional conditions must be met under HRS § 386-1 (1976 Repl.). First, the employee must be loaned or hired out to the other employer for the purpose of furthering the other employer's trade, business, occupation, or profession. Second, as previously stated, control of the employee must be transferred from the original employer to the other employer. If these two conditions are met, the employee will then be considered to be the employee of the other ("special") employer for workers' compensation purposes. The special employer will then become responsible for payment of all workers' compensation benefits to that employee.

Saga definitely qualifies as Yoshino's special employer for workers' compensation purposes. Yoshino was loaned or hired out to Saga for the purpose of furthering Saga's trade, business, occupation, or profession. Saga's primary business was the provision of food services to Mid-Pacific students, staff and guests. Yoshino's efforts were directed entirely toward that end.

Saga contends, however, that Yoshino also helped to further the business or trade of Mid-Pacific, for his work efforts contributed to the overall functioning of Mid-Pacific. We first note that even if we were to accept this proposition, there is no difficulty in seeing that the same statement could be made with regard to each Saga employee who worked at Mid-Pacific. Saga asserts, however, that Yoshino was uniquely situated compared to the other Saga employees because he received free lodging from Mid-Pacific.[4] Hence, Saga argues, Yoshino's relationship with Mid-Pacific was much stronger than that of the other Saga employees, and the benefit which Mid-Pacific derived from Yoshino's employ-

---

[4] The value of this lodging, as stipulated to by the parties in proceedings before the Board, was $250.00 per month.

ment with Saga was of an enhanced nature. The tenuousness of this argument is apparent, for it was actually Yoshino, rather than Mid-Pacific, who derived the benefit from this lodging arrangement. The connection between the lodging afforded to Yoshino and the resultant benefit assertedly conveyed to Mid-Pacific is at best a loose one, and we find it to be of no consequence here.

We are in accord with the Board's view that the primary business of Mid-Pacific was the provision of educational services to its students. The provision of food services was merely incidental to that business, for the adequacy of food services was in no way the central factor in determining whether Mid-Pacific functioned satisfactorily in providing proper educational services to its students. The work being done by Yoshino was essentially that of Saga. This was particularly true in view of the fact that Saga not only prepared food for Mid-Pacific, but also used the Mid-Pacific facility to provide food for three other schools from which Saga derived additional income. Yoshino participated in all these phases of Saga's food preparation at the Mid-Pacific facility. Therefore, Yoshino's employment activities directly furthered the trade or business of Saga rather than of Mid-Pacific.

It is also clear that Saga maintained control over the work performed by Yoshino. First, Yoshino was directly supervised by the Food Service Director employed by Saga at Mid-Pacific. The Food Service Director supervised Yoshino in all the preparation of food items based upon the menu selected by Saga. Saga also dictated most aspects of Yoshino's working conditions, including his hours of employment, holiday schedule, break periods, and so forth. Thus, Saga controlled Yoshino's on-the-job performance. Second, although it is true that Mid-Pacific was understood to have had some kind of consultative rights to changes in Yoshino's employment or wage and benefits status, there is no evidence in the record that indicates that Saga would have been prevented by Mid-Pacific from firing Yoshino or from changing his wage and benefits schedule if good cause were shown therefor. Third, testimony adduced before the Board clearly indicates that Saga unequivocally told Yoshino that he was

indeed an employee of Saga and not of Mid-Pacific.[5] It is thus quite evident that Saga exercised control over the details of Yoshino's work.

Therefore, since Saga had the requisite control of Yoshino and since Yoshino was furthering Saga's trade or business at the time that his injury occurred, we hold that Saga was Yoshino's special employer for workers' compensation purposes. *See* HRS § 386-1 (1976 Repl.), *supra* n. 3; *Kepa, supra*. Thus, Saga is solely liable for the workers' compensation benefits payable to Yoshino.

---

[5] The record reflects the following testimony by Mr. Russell Wright, Hawaii District Manager for Saga:

Q. Now, did Mr. Smith [Food Service Director for Saga at Mid-Pacific] prescribe the duty hours for Mr. Yoshino and all the other employees?

A. He tried. We had some difficulties from time to time on the hours.

Q. Well did this difficulty relate to Mr. Yoshino or something that you would encounter with any employee?

A. The difficulty was related to Mr. Yoshino's original understanding of who he was working for.

Q. But you straightened that out?

A. Right.

Q. You did. Now how did you straighten it out?

A. Sat down and told Mr. Yoshino that we were actually paying him through a reduction of our board billing so that he was working for us.

Q. You told him he was working for you?

A. Yes.

Q. And he knew that didn't he, from that time forward certainly?

A. I'd say he began to understand that, yes.

\* \* \* \* \*

Q. Mr. Wright, what was this original difficulty that you had with Mr. Yoshino as far as who he thought he was working for?

A. We tried to change his hours, weekend hours, and so forth on Saturdays, and he didn't agree with them, and wanted to see Mr. Wheeler [Headmaster at Mid-Pacific], and Mr. Wheeler came down and we sort of arbitrated, and came to some kind of agreement.

Q. You made it a point to give Mr. Yoshino the impression that you had control over his work. Is that correct?

A. That's correct.

\* \* \* \* \*

Our review of the record fails to reveal that the Board's action was clearly erroneous or that it was arbitrary, capricious, or an abuse of discretion. We are consequently unable to conclude that the substantial rights of Saga or Mullen will be prejudiced by the result reached by the Board. *See* HRS § 91-14(g) (1976 Repl.); *De Victoria v. H & K Contractors*, 56 Haw. 552, 545 P.2d 692 (1976).

Affirmed.

*Edward M. Sanpei (Conroy, Hamilton, Gibson, Nickelsen & Rush* of Counsel) for Employer, Insurance Carrier-Appellant.

*Jeffrey S. Portnoy (Cades Schutte Fleming & Wright* of Counsel) for Employer, Insurance Carrier-Appellee.