GEORGE MAKANEOLE, Petitioner–Respondent, v. DRAKE GAM-
PON, Respondent–Appellee, and KAUAI DEVELOPMENT
CORP., dba OHBAYASHI–GUMI, LTD., Petitioner–Respondent,
and NORMAN'S CONSTRUCTION, INC.; N. MURAKAMI,
INC.; NORBUB, INC.; SHERATON CORPORATION; and
JOHN DOES 1–50, Defendants, and DILLINGHAM CON-
STRUCTION CORPORATION, dba HAWAIIAN DREDGING
& CONSTRUCTION COMPANY, LTD., Respondent–
Intervenor–Appellant

NOS. 12049 AND 12218

(CIV. NO. 2915)

JULY 24, 1989

LUM, C.J., PADGETT, HAYASHI, WAKATSUKI, JJ., AND
CIRCUIT JUDGE WILFRED K. WATANABE, IN
PLACE OF NAKAMURA, J., RECUSED

OPINION OF THE COURT BY PADGETT, J.

The Circuit Court of the Fifth Circuit entered an order in these cases granting directed verdicts in favor of Kauai Development Corporation (KDC) and Drake Gampon (Gampon). The Intermediate Court of Appeals (ICA) reversed the directed verdicts. KDC and appellant George Makaneole (Makaneole) filed applications for writs of certiorari which we granted.

We now affirm the ICA's reversal of the directed verdicts but reverse the ICA's holding in section IIIC of its opinion.

The evidence, as stated by the ICA, was as follows:

On September 18, 1981, Makaneole was employed as a carpenter by Plaintiff–Intervenor–Appellant Dillingham Construction Corporation, dba Hawaiian Dredging & Construction Company, Ltd. (Dillingham). KDC was the owner of the Sheraton Kauai Hotel, and had hired Dillingham as the general contractor for the hotel's expansion. Makaneole was injured on the above date while he was working on the roof of the lobby/dining area of the hotel.

The roof was constructed by nailing 4'x8'x1–1/2" plywood sheets adjacent to each other on top of the roof frame to form a base upon which roofing tiles were to be set. A crane was used to raise the plywood sheets, weighing about 200 pounds each, to the roof. The terminal rigging of the crane consisted of a heavy metal "c–clamp" attached to the end of the crane's cable by a loop of rope. When the carpenters were ready for a plywood sheet, a worker on the ground placed a single sheet in the jaws of the c–clamp and tightened the clamp onto the sheet. The plywood sheet was then raised by the crane to a height sufficient to clear the roof, and the boom was swung over to the area on the roof where the workmen were working. The plywood sheet was then lowered and set in place by the workmen. The plywood sheet was then removed from the c–clamp, the c–clamp bolt was tightened all the way down, and the boom was raised and swung back to the area of the plywood supply on the ground.

Both Westford Asao (Asao), Dillingham's acting job superintendent on September 18, 1981, and Frank Merritt (Merritt), Makaneole's expert, testified at trial that the unusually steep pitch of the roof made its construction process dangerous. Asao testified that in erecting a normal roof the plywood sheets could be delivered in bundles to the top of the frame, and stored there while individual sheets were being removed and placed. In this case, however, the pitch of the roof would not allow that procedure and the sheets had to be hoisted individually. The evidence also showed that because of the roof's pitch the

workmen were required to nail lengths of wood horizontally onto the plywood sheets after they were placed on the frame in order to provide themselves a foothold, and that sawdust and chemicals within the plywood made the workmen's footing very precarious.

On the day of Makaneole's injury, the crane was operated by Gampon under the supervision of Glen Tanaka (Tanaka), a Dillingham employee. [Norman's Construction, Inc. (Norman's)] was hired by Dillingham originally as a subcontractor to undertake the crane work for the project. However, when Dillingham later discovered that Norman's was not a licensed contractor, Norman's status was changed, although it is not clear from the record exactly what the new status was. Asao testified that Norman's employees were put on Dillingham's payroll and Norman's was hired as a consultant for "his expertise in the framing" work for the roof. According to Asao, Norman Murakami or [Norbub, Inc. (Norbub)] had a contract to rent the crane to Dillingham and was paid a consultant fee at the end of the project. Gampon testified, on the other hand, that he was paid throughout the job by Norman's. The parties agree, however, that Gampon was Norman's employee.

Just prior to Makaneole's injury, Gampon had raised a sheet of plywood to a group of carpenters working on a part of the roof near where Makaneole was working. Because the crane was not located on the same side of the building where the carpenters and Makaneole were working, Gampon could not see them. He [maneuvered] the plywood sheet into position by responding to signals from one of the carpenters on the peak of the roof. After the sheet of plywood had been removed from the c–clamp by the carpenters, Gampon raised the c–clamp and began to swing the boom towards the area where Makaneole was working, not in the direction of the plywood supply, apparently on Tanaka's orders. Shortly after Gampon began to move the boom, something struck Makaneole's head and he was injured. Although no one saw what hit him, it appears that Makaneole was struck by the c–clamp, since it was found on the ground after the accident. Also, it was not determined whether the c–clamp became detached from the cable, striking Makaneole

as it fell, or whether it struck Makaneole while it was still attached and then fell to the ground. Merritt's opinion was that it was still attached, but KDC and Gampon argue that it probably came loose from the loop of rope, because the jaws had not been bolted closed by the carpenters.

Section 416 of 2 **RESTATEMENT (SECOND) OF TORTS** (1965) at page 395, reads as follows:

> § 416. **Work Dangerous in Absence of Special Precautions**
>
> *One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.*

Section 427 of the same work, provides:

> § 427. **Negligence as to Danger Inherent in the Work**
>
> *One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.*

*Id.* at page 415.

The ICA, quoting from *Jones v. Chevron USA, Inc.*, 718 P.2d 890 (Wyo. 1986), declined to apply the principles stated in the two sections just quoted. The ICA, in this connection, quoted from *Jones* as follows:

> "The employee *** is covered by worker's compensation even if the contractor is insolvent. The owner should not have to pay for injuries caused by the contractor when the worker's compensation system already covers those injuries. *Sloan v. Atlantic Richfield Company*, Alaska, 552 P.2d 157, 160–161 (1976). The owner 'has in a sense already assumed financial responsibility for the injuries' because the independent contractor passes along his worker's compensation costs to the owner.

*Tauscher v. Puget Sound Power & Light Company, supra*, at 430; *Eutsler v. United States*, 376 F.2d 634, 636 (10th Cir. 1967).

Second, under worker's compensation, an employer is released from tort liability for his employee's job–related injuries. If we held an owner vicariously liable for injuries to the contractor's employees, then the owner would be subject to greater liability than if he employed his own workers to do the job. Owners might be encouraged to use their own inexperienced employees instead of experienced independent contractors who specialize in hazardous work. *Tauscher v. Puget Sound Power & Light Company, supra*, at 430–431."

As can be seen from the above quoted language the rationale of *Jones*, and of the ICA, in refusing to apply §§ 416 and 427 of the 2 **RESTATEMENT (SECOND) OF TORTS** was based upon the effect of the workers' compensation statutes, and particularly upon the effect of what in our statutes is HRS § 386–5, which makes compensation under the workers' compensation statute the exclusive remedy which appellant Makaneole would have against his employer. The reasoning is that since the employer is not liable for his negligence there can be no liability on the part of the owner for the employer's negligence despite the dangerous situation which ordinarily would make the owner liable to the person injured when the independent contractor is negligent.

The parties, in their briefs, and the ICA have, however, ignored the evolution of the workers' compensation statutes in Hawaii on this point. The history of that evolutionary development compels a different result.

Prior to the 1963 revision of our workers' compensation statutes, the definition of "employer" for the purposes of the worker's compensation law included an owner, or lessee, of premises or other person, who is virtually the proprietor or operator of the business there carried on. Thus in *Re Ichijiro Ikoma*, 23 Haw. 291 (1916), Oahu Sugar Company was held liable under the workers' compensation law for the injury to an employee of an independent contractor engaged to construct a railroad for the sugar company.

In *Wright Minors v. City & County*, 41 Haw. 603 (1957), the legal relationship of the parties was very similar to our case. In *Wright Minors*, the survivors of a worker who was employed by the general contractor for the Wilson Tunnel, E.E. Black, Limited, and who was killed in the

construction of that tunnel, brought a suit, in negligence, for damages against the City and County of Honolulu, the owner of the premises where the tunnel was being constructed. This court held that, under the then statutory definition, the owner of the premises was an employer for purposes of the Workmen's Compensation Act and therefore the survivors' only remedy was for compensation under that Act.

In 1963, there was a major revision of the Hawaii workers' compensation statutes and the language making the owner of premises the statutory employer was, in the end, deleted from the statute. The story is somewhat complicated.

The revision, as proposed, was to move the language, with respect to the owner being the statutory employer, from the definition of the employer, to the definition of the employee, and to amend it so that it would read:

> Where by reason of there being an independent contractor, or for any other reason, the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on is not the direct employer of persons there employed such persons shall nevertheless be deemed his employees within the meaning of this Act, unless the direct employer has provided insurance for the payment of compensation to them.

S. Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii*, (Rep. No. 1, 1963) at 121.

The explanation for this change was as follows:

> The "contractor clause" contained in the existing definition of "employer" is rephrased and transferred to the definition of "employee". This positional shift is made for the reason that the effect of the clause is to make the employees of the contractor the "statutory employees" of the owner of the business who has contracted out the particular job.
>
> It is recommended, however, that the present rule be qualified so as to place either the exclusive or the primary liability on the direct employer, if he has taken out compensation insurance and the wages of the employee figure in the premium base. The difference between placing the "exclusive" liability on the employer rather than the "primary" liability lies in the effect of this distinction on the tort liability of the owner and his other

employees. *If it is desired to shield the owner and his other employees from third party liability, then secondary liability must be left imposed upon the owner. Vice versa, if it is desired to give the victim in cases of negligence an action at law either against the owner or his negligent employees, the direct employer must be exclusively liable.*

The suggested form of the statute makes the insured direct employer exclusively liable.

*Id*. at 99–100 (emphasis supplied).

In *Fonseca v. Pacific Constr. Co.*, 54 Haw. 578, 513 P.2d 156 (1973), this court held that a general contractor was not immune from suit, for the injuries sustained by a subcontractor's employee, resulting from the general contractor's negligence. Justice Marumoto, who wrote the opinion in *Wright Minors, supra*, dissented. In the course of that dissent he traced the history of the 1963 statutory overhaul, and noted at 54 Haw. at 592–93:

However, the quoted clause effected a material change. It imposed exclusive liability upon an insured direct employer. The imposition of exclusive liability upon an insured direct employer had the effect of denying the status of a statutory employer to an owner, and rendering HRS § 386–5 inapplicable to him, in his relationship with the employees of such direct employer.

The clause did not affect the status of an owner as a statutory employer of the employees of an uninsured direct employer.

Thus, under the draft provision, an owner would have been a statutory employer only in his relationship to the employees of an uninsured direct employer.

As Justice Marumoto went on to note, however, the draft language was not the language as passed. The sentence above quoted was deleted and the following sentence substituted therefor:

The employee shall be deemed to remain in the sole employment of the original employer if such other person fails to secure compensation to the employee as provided in section 97–120.

Act 116, 1963 Haw. Sess. Laws at 103.

The effect of the amendment, and the deletion was that the owner of the premises was no longer a statutory employer exempted from suits for negligence under § 386–5. As stated by Justice Marumoto in *Fonseca*:

> The conclusion to be drawn . . . is that, in enacting the present provision, the legislature intended . . . to deny that status [statutory employer] . . : to owners . . . even in a situation in which the direct employer is uninsured.

54 Haw. at 593–94.

Since the owner of the premises is not an employer, the owner does not fall within the provisions of HRS § 386–5 which exempts employers from liability to employees. Accordingly, contrary to the result in *Jones, supra*, the workers' compensation statutes in the State of Hawaii provide no basis for disregarding the legal principles laid down in §§ 416 and 427 of 2 **RESTATEMENT (SECOND) OF TORTS.** Therefore, section IIIC of the opinion of the ICA is reversed.

The judgment of the ICA reversing the judgments below and the directed verdicts is affirmed and the case is remanded to the circuit court for further proceedings in accordance with the opinion of this court and those portions of the opinion of the ICA not reversed by this opinion.

*Herbert R. Takahashi, Stanford H. Masui* and *Danny J. Vasconcellos* on the petition and supplemental brief for Makaneole.

*Kenneth S. Robbins, Philip S. Nerney* and *Wayne P. Doane* on the petition and supplemental brief for Kauai Development.