900 P.2d 784

**LOCATIONS, INCORPORATED,**
Appellant–Appellee,

v.

**HAWAI'I DEPARTMENT OF LABOR
AND INDUSTRIAL RELATIONS,**
Appellee–Appellant.

No. 17275.

Supreme Court of Hawai'i.

July 28, 1995.

Before MOON, C.J., LEVINSON and NAKAYAMA, JJ., Circuit Judge HUDDY, in place of KLEIN, J., recused, and Circuit Judge CRANDALL, in place of RAMIL, J., recused.

MOON, Chief Justice.

Appellant State of Hawai'i, Department of Labor and Industrial Relations (the DLIR), appeals from the judgment of the circuit court, reversing its declaratory ruling. The DLIR contends on appeal that the circuit court erred in its determination that licensed real estate agents who perform sales activities pursuant to "independent contractor agreements" with appellee Locations, Inc. (Locations) are "independent contractors" and not "employees" for purposes of Hawai'i's workers' compensation laws.

As a matter of law, we hold that Locations-agents [1] are independent contractors and not employees. Accordingly, we affirm the circuit court's judgment.

## I. BACKGROUND

Locations, a real estate sales company, petitioned the DLIR for a declaratory ruling that, for purposes of Hawai'i's workers' compensation laws, the licensed real estate agents who perform sales activities pursuant to "independent contractor agreements" with Locations are not "employees" and, therefore, that Locations need not provide mandatory workers' compensation coverage for them.

Based upon undisputed facts submitted solely by Locations, the DLIR ruled that Locations-agents are "employees" for workers' compensation purposes. Locations thereafter timely appealed the DLIR's declaratory ruling to the circuit court. The circuit court granted Locations's appeal, reversed the DLIR's declaratory ruling, and concluded that "Locations, Inc.'s licensed real estate agents, hired pursuant to independent contractor agreements, are independent contractors and not employees for pur-

Leo B. Young, Deputy Atty. Gen., Honolulu, for appellee-appellant Dept. of Labor and Indus. Relations, State of Hawai'i.

Ellen Godbey Carson (Paul Alston, with her on the brief, of Alston, Hunt, Floyd & Ing), Honolulu, for appellant-appellee Locations, Inc.

Wayne M. Pitluck and Dana K.N. Sato of Pitluck & Kido, on the brief, Honolulu, for amicus curiae, Hawai'i Ass'n of Realtors.

1. For purposes of this appeal, "Locations-agents" refer to those persons who are licensed pursuant to Hawai'i Revised Statutes (HRS) chapter 467 (Real Estate Brokers and Salespersons) and who perform sales activities for Loca-
tions pursuant to independent contractor agreements. The term "Locations-agents" does not include those licensed salespersons who act in other capacities for Locations.

**210**

poses of Hawai'i's Workers Compensation laws." The DLIR timely appeals from the circuit court's final judgment.

## II. *STANDARD OF REVIEW*

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. . . . The standard of review is one in which this court

> must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [2] to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Sussel v. Civil Service Comm'n,* 74 Haw. 599, 608, 851 P.2d 311, 316, *reconsideration denied,* 74 Haw. 650, 857 P.2d 600 (1993) (internal brackets and quotation marks omitted) (quoting *Chock v. Bitterman,* 5 Haw.App. 59, 64, 678 P.2d 576, 580, *cert. denied,* 67 Haw. 685, 744 P.2d 781 (1984)).

■ The circuit court's determination that Locations-agents are independent contractors and not employees is a question of law freely reviewable by an appellate court under HRS § 91–14(g)(4). *See Sussel,* 74 Haw. at 610, 851 P.2d at 317, (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992)).

2. HRS § 91–14(g) (1985) provides:
   Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
   (1) In violation of constitutional or statutory provisions; or
   (2) In excess of the statutory authority or jurisdiction of the agency; or
   (3) Made upon unlawful procedure; or
   (4) Affected by other error of law; or
   (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

## III. *DISCUSSION*

### A. *Hawai'i's Workers' Compensation Laws Pertain Only to Employer–Employee Relationships.*

■ Although licensed real estate agents are considered independent contractors under myriad state and federal statutes,[3] Hawai'i's workers' compensation laws, codified in HRS chapter 386, do not specify whether such agents are employees or independent contractors. For purposes of coverage, HRS chapter 386, pertains only to "employees" who are "individual[s] in the employment of another person." HRS § 386–1 (1985). With respect to independent contractors, this court has held that a party who hires an independent contractor is not an employer, and thus, "does not fall within the provisions of HRS § 386–5 which exempts employers from liability to [their] employees." *Makaneole v. Gampon,* 70 Haw. 501, 508, 777 P.2d 1183, 1187 (1989). It therefore follows that a party who contracts with an independent contractor need not provide workers' compensation coverage for that independent contractor.

■ The DLIR has observed that:
Work[ers'] compensation laws are highly remedial in character. Their paramount purpose is to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause. Courts should therefore give them a liberal construction in order to accomplish their beneficent purposes.

> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

3. For example, HRS § 393–5(5) (1985) excludes "real estate sales[persons]" and "real estate broker[s]" from employment laws requiring prepaid health plans, provided that the agent's sole means of compensation is by way of commission. Additionally, such individuals are distinguished from real estate salespersons "who are not employees and are licensed pursuant to [HRS] chapter 467" for general excise tax purposes. HRS § 237–18(f) (1985). The Internal Revenue Code also treats real estate agents whose remuneration is based on sales rather than number of hours worked as independent contractors. 26 U.S.C. § 3508(b)(1).

*Evanson v. University of Hawai'i*, 52 Haw. 595, 600, 483 P.2d 187, 191 (1971) (citations omitted). Consequently, the DLIR contends that "the term 'employee' as used in the workers' compensation context, should be liberally construed to achieve the beneficent intent of workers' compensation statutes." Although Locations does not dispute this contention, and although we recognize the beneficent purposes and the remedial nature of Hawai'i's workers' compensation laws, "[t]he rule of liberal construction cannot be strained to the point of extending it to employments not within its scope or intent." *Florida Indus. Comm'n v. Schoenberg*, 117 So.2d 538, 541 (Fla.Dist.Ct.App.1960). Simply stated, there can be no workers' compensation coverage absent an employment relationship. *See Harter v. County of Hawai'i*, 63 Haw. 374, 378 n. 3, 628 P.2d 629, 632 n. 3 (1981) (the relationship between employer and employee must be entered into in a deliberate manner with the informed consent of both parties).

### B. *Determining the Existence of an Employer–Employee Relationship*

■ Although the relationship between Locations and Locations-agents is based on independent contractor agreements, it is well-settled that the existence of independent contractor agreements, standing alone, would not exempt Locations from providing workers' compensation coverage if the true nature of the relationship is that of employer-employee. This court has recognized that an employment relationship may exist even in situations in which the parties have "agreed" not to label themselves as employer and employee.

For example, in *Bailey's Bakery v. Borthwick*, 38 Haw. 16 (1948), a bakery unilaterally redesignated its deliverypersons as "vendees," purportedly in an attempt to avoid paying into Hawai'i's unemployment fund. Prior to the redesignation, the drivers for the bakery had delivered bread to retailers and had worked for stated hours and wages. Under the new delivery system, the bakery ceased to furnish delivery equipment, but sold or financed the purchase of such equipment to drivers who wished to purchase

them. The drivers were responsible for collecting payment from the retailers. The drivers retained the differential between the wholesale price charged to the retailers and the reduced price charged to the driver at the plant, both amounts being fixed by the bakery. Although the bakery exercised no control over the delivery equipment or the manner of its operation, the bakery exercised complete control over the deliveries themselves, including the delivery routes, which were divided so that there was no competition between drivers. Bread prices were also fixed by the bakery. *Id.* at 18–19.

■ In determining the existence of an employment relationship, this court in *Bailey's Bakery* applied the "control test," consistent with the test set forth in *Tomondong v. Ikezaki*, 32 Haw. 373 (1932). Under the control test, an employment relationship is established when "the person in whose behalf the work is done has the power, express or implied, to dictate the means and methods by which the work is to be accomplished." *Id.* at 380. In contrast,

> [o]ne who contracts with another to do a specific piece of work for him [or her], and who furnishes and has the absolute control of his [or her] assistants, and who executes the work entirely in accord with his [or her] own ideas, or with a plan previously given him [or her] by the person for whom the work is done, without being subject to the latter's orders in respect of the details of the work, with absolute control thereof, is not a servant of his [or her] employer, but is an independent contractor.

*Id.* at 378. Subsequent to its examination of the relationship between the bakery and its redesignated deliverypersons, this court held that "the relation ... [was] that of master and servant ... not that of [independent contractor and contractee]." *Bailey's Bakery*, 38 Haw. at 16.

In subsequent cases, this court has continued to follow the control test to determine the existence of an employment relationship. *See Kepa v. Hawai'i Welding*, 56 Haw. 544, 548, 545 P.2d 687, 691 (1976) ("The paramount consideration in determining whether the alleged special employer is in fact a

special employer of the worker in work[ers'] compensation lent employee cases [is] whether the alleged special employer exercised control over the details of the work of the loaned employee and such control strongly supports the inference that a special employment [relationship] exists"); *Yoshino v. Saga Food Serv.*, 59 Haw. 139, 143, 577 P.2d 787, 790 (1978) (The control test "looks to the degree of control exercised by each employer with regard to the employee."); *Harter*, 63 Haw. at 379, 628 P.2d at 632 (the control test is the primary guideline for determining whether an employer is a special employer for workers' compensation purposes).

## C. The DLIR Erred in Determining that Locations and Locations–Agents Were in an Employment Relationship.

In the present case, the DLIR applied the control test as well as the "relative nature of the work" test in determining that Locations-agents are "employees" for workers' compensation purposes. The relative nature of the work test "involves a balancing of factors regarding the general relationships which the employee has with regard to the work performed for each of his [or her] employers." *Yoshino*, 59 Haw. at 143, 577 P.2d at 790. The factors to be considered are: "whether the work done is an integral part of the employer's regular business; and whether the worker, in relation to the employer's business, is in a business or profession of his own." 1B A. Larson, *Larson's Workmen's Compensation Law* § 43.53 (1993).

Although the DLIR employed both tests, its ruling in the present case expressed its preference for the "relative nature of the work" test:

> The traditional common law definition of "control" has been much eroded with the development of modern technology. An enlightened view is to "reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute," and in doubtful situations make [a] determination based on the "underlying economic facts rather than technical and exclusive legal classifications."
>
> The Labor and Industrial Relations Appeal Board, (LIRAB), State of Hawai'i, has

used the "relative nature of the work" test to determine a worker's status as an employee or independent contractor.

We also find that regardless of the degree of supervision exercised by Locations, the activities of [Locations-agents] form a continuous economic relation for mutual profit. Further, the activities of [Locations-agents] are an integral part of Locations' business to satisfy the "relative nature of the work" test. Accordingly, we find that [Locations-agents] are considered "employees."

In *Yoshino*, however, this court expressly disapproved the DLIR's primary use of the "relative nature of the work" test. As in the present case, the DLIR in *Yoshino* utilized both the control test and the relative nature of the work test to determine whether a claimant was an "employee" for workers' compensation purposes, but "stated a clear preference for the relative nature of the work test." *Yoshino*, 59 Haw. at 143, 577 P.2d at 790. On appeal, although we agreed with the result reached by the DLIR, we stated that "we must disapprove of the [DLIR's] primary emphasis upon the relative nature of the work test." *Id.* Thus, our decision in *Yoshino* made it "clear that the control test is the primary guideline for determining [an employment relationship] for workers' compensation purposes." *Id.; accord Kepa*, 56 Haw. at 548, 545 P.2d at 691; *Harter*, 63 Haw. at 379, 628 P.2d at 632.

■ However, despite our express disapproval of the relative nature of the work test in *Yoshino*, the DLIR has continued to use it as a primary basis upon which to determine whether a person is an "employee." Recognizing that our preference for the control test may not have been stated emphatically enough in *Yoshino*, and "that in retrospect our pronouncements are sometimes more enigmatic than we would wish," *State v. Schroeder*, 76 Hawai'i 517, 524, 880 P.2d 192, 199 (1994), we now explicitly hold that the control test, and not the relative nature of the work test, is the proper test to determine whether an employer-employee relationship exists for purposes of workers' compensation laws. Accordingly, we examine the relationship be-

tween Locations and Locations-agents under the control test.

### D. *Applying the Control Test to Locations and Locations–Agents*

Although we have not had previous occasion to decide whether licensed real estate agents are "employees" for purposes of Hawai'i's workers' compensation laws, courts in numerous other jurisdictions, applying the control test, have held that real estate agents are "independent contractors" if they: (i) are paid by commission; (ii) supply their own automobiles and insurance; (iii) are not required to keep fixed hours; and (iv) are dependent on their own efforts to sell real estate. *See, e.g., Dimmitt–Rickhoff–Bayer Real Estate Co. v. Finnegan,* 179 F.2d 882, 886–87 (8th Cir.), *cert. denied,* 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950); *Commonwealth v. Savage,* 31 Mass.App. 714, 583 N.E.2d 276 (1991); *Edwards v. Caulfield,* 560 So.2d 364, 372 (1990); *Henry Broderick, Inc. v. Squire,* 163 F.2d 980, 982–983 (9th Cir. 1947); *Schoenberg,* 117 So.2d at 541–43.

In *Dimmitt,* the court of appeals deemed real estate agents to be "independent contractors" in situations where they are "almost entirely dependent upon their own initiative, efforts, skill, and personality for success, working upon their own time, at their own expense, and deriving their remuneration from the results of their work." *Dimmitt,* 179 F.2d at 888. In the present case, the agents' activities, pursuant to their independent contractor agreements with Locations, are consistent with the indicia considered dispositive by the *Dimmitt* court. At the hearing on the declaratory ruling, the following undisputed facts regarding Locations and Locations-agents were ascertained:

(1) Locations-agents are hired pursuant to independent contractor agreements;

(2) Locations-agents are compensated solely by commission;

(3) Locations does not pay withholding taxes, social security, unemployment compensation, health insurance, life insurance, pension, retirement benefits, sick leave, or annual leave for Locations-agents;

(4) Locations-agents pay for their own expenses and equipment, including car, gas, long distance phone calls and fax, postage, cellular phones, couriers, professional dues, business cards, multiple listing service, and professional liability insurance. Locations permits Locations-agents the use of its general office space, phones, computers and research assistance, subject to the above agent-borne expenses;

(5) Locations does not direct or control Locations-agents' hours, open houses, floor time, leads, or contacts with clients;

(6) Locations-agents are not required to service any listing, are free to solicit any residential listings and sales as they wish, and are free to exercise their own independent judgment on business matters, within the framework set by state law, professional ethics, and good business practices; and

(7) Locations, as the broker, oversees Locations-agents' activities as required by HRS chapter 467 (Real Estate Brokers and Salespersons) by: participating as the supervising broker in each sale consummated by Locations-agents; providing training and guidelines to assure compliance with legal requirements; and reviewing transactions to assure compliance with HRS chapter 467.

Relying on *Faith Realty & Development Co. v. Industrial Commission,* 170 Colo. 215, 460 P.2d 228 (1969) and *Hughes v. Industrial Commission,* 113 Ariz. 517, 558 P.2d 11 (1976), the DLIR contends that, notwithstanding the control test, real estate agents are employees entitled to workers' compensation. Both cases are, however, distinguishable.

Although utilizing "control" tests, the courts in both *Faith Realty* and *Hughes* relied mainly on their respective state real estate licensing statutes that referred to real estate agents as "employees" in "employment" who are "employed" by their brokers. Further, the respective legislative histories of the statutes at issue supported this limited definition. *Faith Realty,* 170 Colo. at 220,

460 P.2d at 230; *Hughes,* 113 Ariz. at 519, 558 P.2d at 13. In both cases, the courts construed their respective workers' compensation statutes in *pari materia* with their real estate statutes and concluded that an employment relationship existed for workers' compensation purposes, despite the fact that salespersons were compensated solely by commission and did not work set hours. *Faith Realty,* 170 Colo. at 219, 460 P.2d at 229; *Hughes,* 113 Ariz. at 519–20, 558 P.2d at 13–14. Moreover, the *Hughes* court relied on Arizona's unemployment insurance laws, which designated real estate agents as "employees," *Hughes,* 113 Ariz. at 520, 558 P.2d at 14, whereas, in Hawai'i, the unemployment law treats real estate agents as "independent contractors," and not as "employees." HRS § 383–7(17) (1985).[4]

In this jurisdiction, HRS chapter 467 (Real Estate Brokers and Salespersons) expressly affords real estate salespersons the option to choose between being (i) *"employed* either directly or indirectly by a real estate broker" or (ii) "an independent contractor in association with a real estate broker." HRS § 467–1 (Supp.1991) (emphasis added).

▆ Nevertheless, the DLIR contends that Locations exerts a level of control over Locations-agents sufficient to create an employer-employee relationship. For example, the DLIR's declaratory ruling summarizes the following facts, ascertained from Locations's Sales Division Manual submitted under seal:

> Location's [sic] Sales Division Manual documents that it controls the manner and type of listings [Locations-agents] may have. [Locations-agents] are limited to only residential type listing[s]. Further, [Locations-agents] having at least a 50%

interest in real property that is listed for sale must be listed with Locations.

Locations specifies the type, number, and internal routing of various forms used in real estate transactions. Failure to follow guidelines exposes [Locations-agents] to sanctions, to include the right to terminate employment. Further control concerns the manner that potential litigation is handled. [Locations-agents] must notify Locations and Locations may share the liability for any tortious act or breach of contract committed by [Locations-agents].

Locations maintains that these controls are not sufficient to establish an employer-employee relationship because these controls are mandated by law. The question thus narrows to whether statutorily-mandated control by a putative employer is sufficient to establish an employment relationship.

### E. *Statutorily–Mandated Control over Agents*

Because of the importance and pervasiveness of the real estate business in Hawai'i, the industry is heavily regulated. Consequently, statutes regulating real estate brokers and salespersons, HRS chapter 467, and Hawai'i's administrative rules (HAR), Title 16, HAR chapter 99, contain provisions that impose certain supervisory requirements on real estate brokers.

HRS § 467–1 (Supp.1991) pronounces broadly that "[e]very real estate salesperson must be under the direction of a broker for all real estate transactions," regardless of whether that salesperson is an employee or an independent contractor. Licensed real estate salespersons, referred to as "licensees," are prohibited from acting as a broker, performing brokerage services, or directly managing brokerage activities. *See, e.g.,* HRS § 467–14(5), (6), (9), and (10).[5] Conse-

---

4. HRS § 383–7 provides in pertinent part:
   "Employment" does not include the following service:
   . . . .
   (17) Service performed by an individual for an employing unit as a real estate sales[person], if all such service performed by such individual for such employing unit is performed for remuneration solely by way of commission[.]

5. HRS § 467–14 (Supp.1991) provides in pertinent part:

[T]he real estate commission may revoke any license issued under this chapter, or suspend the right of the licensee to use the license, for any cause authorized by law, including but not limited to the following:

. . . .

(5) When the licensee, being a real estate salesperson, accepts any commission or other compensation for the performance of any of the acts enumerated in the definition set forth in section 467–1 of real estate salesperson from any person, copartnership, or corporation oth-

quently, licensed real estate salespersons must work exclusively under the supervision of a real estate broker.

HAR chapter 99, which also refers to licensed real estate salespersons as "licensees," was "intended to clarify and implement [HRS] chapter 467," HAR § 16–99–1, by imposing, *inter alia*, the following supervisory requirements on brokers:

1. Licensees are required to live sufficiently close to their broker's place of business so that "reasonable supervision [can] be maintained by the broker". *See* HAR § 16–99–5(f).

2. For the protection of all parties with whom licensees deal, all sales agreements and other sales transactions by licensees must be reviewed by their brokers. *See* HAR § 16–99–3(f).

3. The licensee cannot offer for sale, lease, exchange, or rent, property which the licensee owns or has an interest in, without fully informing the licensee's broker of any such intent. *See* HAR § 16–99–3(g).

4. The licensee cannot place a sign or advertisement for a property without the approval of the licensee's broker. *See* HAR § 16–99–3(*l*).

5. The licensee is prohibited from associating with more than one broker, and all real estate sales work must be supervised by the licensee's broker. *See* HAR § 16–99–3(p).

As these examples indicate, real estate brokers are responsible for their licensees' compliance with a broad range of statutes and regulations regarding real estate transactions in order to "fully protect the general public in its real estate transactions[.]" HAR § 16–99–3. However, as Locations notes, despite the level of control mandated by law, HRS § 467–1.5 clearly preserves a broker's right to treat its licensed real estate salespersons as independent contractors:

> *Nothing in this chapter or in any of the rules adopted to implement this chapter* [e.g. HAR chapter 99] *shall be deemed to create an employer-employee relationship between a real estate broker and the broker's licensees [agents];* provided that the commission shall have all power necessary to regulate the relationships, duties and liabilities among real estate brokers and real estate salespersons in order to protect the public.

HRS § 467–1.5 (1985 and Supp.1991) (emphasis added). The plain language of the statute conclusively establishes that statutorily-mandated control cannot create an employment relationship. *See also* Sen. Comm.Rep. No. 769, in 1977 Senate Journal at 1178–79 (a licensed real estate agents' independent contractor status will in no way relieve a firm's principal broker of the responsibility to scrutinize the professional actions of its agents regarding real estate transactions). "[W]here the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *State v. Ramela*, 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994) (citation omitted).

In addition to the statute's plain language and intent, cases addressing this issue have recognized that statutorily-mandated "control" cannot create an employment relationship. In *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354 (9th Cir.1975), the court of appeals

---

er than the salesperson's employer or the broker with whom the salesperson associates or, being a real estate broker or salesperson, compensates one not licensed under this chapter to perform any such act;
(6) When the licensee, being a real estate salesperson, acts or attempts to act as a real estate broker or represents, or attempts to represent, any real estate broker other than the salesperson's employer or the broker with whom the salesperson is associated;
. . . .
(9) When the licensee, being a copartnership, permits any member of the copartnership who does not hold a real estate broker's license to

actively participate in the real estate brokerage business thereof or permits any employee thereof who does not hold a real estate salesperson's license to act as a real estate salesperson therefor;

. . . .

(10) When the licensee, being a corporation, permits any officer or employee of the corporation who does not hold a real estate broker's license to have the direct management of the real estate brokerage business thereof or permits any officer or employee thereof who does not hold a real estate salesperson's license to act as a real estate salesperson therefor[.]

held that "the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship." *Id.* at 359 (citations omitted); *see also North American Van Lines, Inc. v. NLRB,* 869 F.2d 596, 599 (D.C.Cir.1989) ("employer efforts to ensure the worker's compliance with government regulations, even when those efforts restrict the manner of performance, do not weigh in favor of employee status") (*citing Local 777, Democratic Union Organizing Comm. v. NLRB,* 603 F.2d 862 (D.C.Cir.1978)). In *Local 777,* the court of appeals held that no employment relationship was created where taxicab companies exercised virtually no control over their drivers "independent of municipal regulations, which are themselves beyond the company's control." *Id.* at 875. In rejecting the labor board's finding that companies that incorporated municipal ordinances into their own regulations thus exercised control over their drivers, the court of appeals reasoned that

> [g]overnment regulations constitute supervision not by the employer but by the state. Thus, to the extent that the government regulation of a particular occupation is more extensive, the control by a putative employer becomes less extensive because the employer cannot evade the law either and in requiring compliance with the law he is not controlling the driver. It is the law that controls the driver.

*Id.* (footnote and citation omitted).

■ Moreover, it is well settled that "controls imposed by an employer to ensure compliance with governmental regulations 'do not evidence an employee-employer relationship unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control.'" *ARA Leisure Serv., Inc. v. NLRB,* 782 F.2d 456, 461 (4th Cir.1986) (quoting *NLRB v. Associated Diamond Cabs, Inc.,* 702 F.2d 912, 922 (11th Cir.1983)); *see also Air Transit, Inc. v. NLRB,* 679 F.2d 1095, 1098 (4th Cir.1982); *NLRB v. Tri-State Transport Corp.,* 649 F.2d 993, 995 (4th Cir.1981).

■ In view of HRS § 467–1.5 and the relevant case law, we hold that a putative employer's compliance with statutorily-man-dated control is insufficient to establish an employer-employee relationship for purposes of workers' compensation laws, unless the control becomes so pervasive as to significantly exceed the scope of such statutory compliance. Thus, we turn now to the question whether Locations significantly exceeded the scope of statutorily-mandated control.

### F. *Locations's Control over Locations–Agents*

The DLIR contends that, by directing, supervising, and monitoring the Locations-agents' actual work processes, Locations exerts a degree of control over Locations-agents that exceeds the scope of HRS chapter 467 and HAR chapter 99. Alluding to provisions in Locations's "independent contractor agreement," "sales manual," and "sales division policies," the DLIR asserts that: (i) maintaining the right to terminate; (ii) directing the listing of Locations-agents's own property; (iii) controlling public liability; (iv) exercising control over compensation; and (v) issuing general administrative management directives all demonstrate indicia of control on the part of Locations sufficient to establish an employment relationship. We disagree.

■ Locations's "independent contractor agreement" states that "[e]ither party may terminate this agreement at any time for any reason that party, in its discretion, deems appropriate[,]" and that, therefore, it is clear that Locations and Locations-agents retain a mutual right to terminate the independent contractor relationship at any time. A business relationship terminable at will does not, as a *per se* matter, establish an employment relationship. *Dimmitt,* 179 F.2d at 885–87; *Edwards,* 560 So.2d at 372; *United States v. Silk,* 331 U.S. 704, 709, 719, 67 S.Ct. 1463, 1466, 1471, 91 L.Ed. 1757 (1947). In *Schoenberg,* the district court of appeals held that "[t]he [real estate] broker's right to terminate the [real estate] sales[person]'s services at any time is not per se indicative of an employee-employer status when other evidence fully supports the presence of an independent contractor relationship." 117 So.2d at 542 (citation omitted). Inasmuch as the

present case displays all the classic indicia of an independent contractor relationship (*i.e.*, Locations-agents are hired pursuant to an independent contractor agreement, are compensated solely by commission, incur personal expenses, set their own hours, and use independent judgment within the limits required by law), it is clear that an option to terminate the agreement merely accords (1) Locations the means to maintain supervisory controls over Locations-agents as required by law and (2) Locations-agents the flexibility to opt into an employment relationship pursuant to HRS § 467–1.

Locations' policy requiring that Locations-agents list their own properties with Locations is necessary to ensure compliance with the disclosure requirements of HAR § 16–99–3(g), which provides in pertinent part that

> [w]hen offering for sale, lease, exchange, or rental, property which the [agent] owns or has an interest in, the [agent] shall fully inform the principal broker of the [agent's] intention to sell, lease, exchange, or rent, and of the [agent's] interest in property. The [agent] shall reveal the interest to the purchaser, lessee, or tenant in writing prior to accepting any offer.

Thus, the listing of agent-owned properties is preventive in nature because misrepresentation could result in a revocation or suspension of the agent's license, under HRS § 467–14, and could expose Locations to potential vicarious liability for the conduct of its agents, pursuant to HRS chapter 467.

Locations also provides professional liability insurance, absorbs substantial liability, reserves a first option to choose legal defense, and indemnifies Locations-agents. As noted previously, HRS § 467–1 (Supp.1991) requires that "[e]very real estate salesperson must be under the direction of a broker for all real estate transactions." Given the possibility of vicarious liability under HRS chapter 467, the control necessary to ensure that claims against Locations are well-defended is consistent with the intent of HRS § 467–1 and Locations's attendant obligations and rights and cannot be read as significantly

exceeding the scope of control pursuant to statute.

In fixing the time for compensation renegotiations, controlling the receipt of bonuses, and providing monthly awards, Locations's control in the area of compensation does not significantly exceed certain HAR mandates requiring that: (i) monies in trust for other persons shall be placed in special bank accounts; (ii) transactions involving financial obligations and real estate commitments be in writing; and (iii) compensation of another broker's agent be made to the broker and not directly to the agent. *See* HAR §§ 16–99–3(e), (f), and (k). Locations-agents are compensated solely by commission, with greater commission percentages awarded at higher levels of production. Under the control test, it is apparent that, although these commission schemes may provide an incentive for greater production, they do not "dictate the means and methods by which the work is to be accomplished," nor are they sufficient to create an employer-employee relationship between Locations and Locations-agents. *See Tomondong*, 32 Haw. at 380.

Finally, we review the "general administrative management" procedures contained in Locations's Sales Division Manual. These controls, taken individually or collectively, are reasonably related to Locations's statutory duties as broker for Locations-agents' sales transactions and to the potential vicarious liability for the conduct of Locations-agents. Locations requires training, record keeping, and written disclosures and penalizes late closings, to assure compliance with HRS chapter 467 and HAR chapter 99. Locations controls scheduling for "floor time" [6] to provide for the orderly conduct of its business, but floor time is neither required nor compensated for and is entirely voluntary. Locations limits Locations-agents to residential sales because its business is limited to residential sales. Locations undertakes a certain risk of exposure to vicarious liability and, in return, should be able to expect a certain minimum level of performance from Locations-agents pursuant to its directives.

---

**6.** Based on our reading of Locations's Sales Division Manual, Locations-agents who request

"floor time" handle all telephone inquiries and walk-in customers at Locations's branch offices.

Based on our review of the record, we hold that, because the control exercised by Locations is neither pervasive nor exceeds the scope of control mandated by law, there is no employer-employee relationship between Locations and Locations-agents. It therefore follows as a matter of law, and we so hold, that Locations-agents are independent contractors and not employees for purposes of Hawai'i's workers' compensation laws.

## IV. CONCLUSION

Based on the foregoing, the judgment of the circuit court is affirmed.