Electronically Filed
Supreme Court
SCWC-19-0000552
22-APR-2025
09:11 AM
Dkt. 7 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

JAMES C. BORRSON,
Petitioner/Claimant-Appellee-Appellant,

vs.

BRENDA B. WEEKS,
Respondent/Employer-Appellant-Appellee,

and

SPECIAL COMPENSATION FUND,
Respondent/Appellee-Appellee.

SCWC-19-0000552

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000552; CASE NO. AB 2017-041(WH); DCD NO. 9-16-00359)

APRIL 22, 2025

McKENNA, EDDINS, AND DEVENS, JJ.;
WITH GINOZA, J., CONCURRING SEPARATELY
AND DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY EDDINS, J.

A landlord operated "a business renting homes."  A tenant

performed repair, maintenance, and improvement work for that

business. In return, the landlord reduced the tenant's rent and paid him. The tenant fell while doing roof work on one of the landlord's five rental units.

The tenant filed a workers' compensation claim. The landlord denied an employment relationship existed and disputed that the tenant suffered a work-related injury.

We hold that in the workers' compensation context, there was an employer-employee relationship between the landlord and tenant.

**I.**

Brenda Weeks' Hawai'i Island property totals 5.5 acres. She leases 4.5 acres to a coffee farmer. The other acre has five rental structures: a "main house," an "apartment," and "three renovated coffee shacks," one known as the "two-story cabin." As a landlord managing those units, Weeks has always lived on site.

From 2013 to 2015, Petitioner James Borrson and his wife rented the two-story cabin from Weeks. The record is unclear, but it appears that around August 2015, Weeks moved into the cabin. She had lived in the main house for years. The Borrsons relocated to a different unit. Weeks rented the main house to another couple. Borrson testified that when tenants moved out, he helped Weeks advertise units on Craigslist to fill the vacancies.

Weeks and the Borrsons signed rental agreements in 2013, 2014, and 2015.  Per the 2013 rental agreement, Weeks agreed that the Borrsons' rent would be offset by "in-kind" work.  The 2013 contract also had a "Yard Maintenance Agreement," common to all tenants.  Paragraph 1 required James Borrson to mow his lawn area at least once every other week.

In 2014, the Borrsons and Weeks entered another one year rental agreement.  Again, they agreed that rent would be offset with "in-kind" work.  This contract had no Yard Maintenance Agreement.

As part of the 2015 rental agreement, Weeks and Borrson signed the same Yard Maintenance Agreement as in 2013.  But Weeks handwrote two changes to that preprinted document.  First, in addition to Borrson's own yard work, Weeks added language to paragraph 1: Borrson would perform other yard maintenance work around the property "as needed," but "not more than ten hrs [per] month."

Second, Weeks added paragraph 9.  "Any Agreed upon work over 10 [hours] monthly @ $15.00 hr for [the Borrsons] – Also any reimbursed purchases require prior Authorization."  Weeks double underlined the word "agreed" for emphasis.  Borrson signed the agreement.  Weeks later said that Borrson would ask for payment after completing unauthorized work on the property.

3

This stopped, she maintained, once they agreed to paragraph 9. Borrson disputed Weeks' assertions.

Over the years, Borrson undertook many projects, big and small, around Weeks' property. He built a pantry, deck, and closet organizer in a unit. He installed a rain gutter on the lanai of a different unit. His maintenance jobs included changing a bathroom faucet, cleaning drains, repairing closet shelves and drawers, and drywall work. Also, while Weeks traveled overseas, Borrson coordinated repairs after a fire damaged the property's water pipes. Per their agreement, he received reduced rent and got paid for his work.

In September 2015, Borrson installed some metal panels to the two-story cabin's tin roof. While doing this work, he fell off a ladder. His left arm fractured.

At the time, Weeks lived in the cabin. From the second story, she says she heard noise and went outside. She saw Borrson on a ladder and asked what he was doing. He explained that he was working on the roof. Weeks says the ladder then buckled, and Borrson fell. Shortly, an ambulance arrived. Borrson maintained that Weeks told him to work on the roof.

In April 2016, Borrson filed a workers' compensation claim. He said he worked as Weeks' "maintenance man" from 2013 – 2015. Borrson also mentioned that Weeks "witnessed the fall." In her WC-1 Employer's Report of Industrial injury, Weeks denied that

she employed Borrson.  Weeks lacked workers' compensation insurance coverage.

The Director of the Department of Labor and Industrial Relations (Director) reviewed the claim.  Hawai'i Revised Statutes (HRS) § 386-73 (2015).  The Director ruled for Borrson.

Borrson performed work to further Weeks' rental business, the Director determined.  In exchange, he got reduced rent.  Weeks also paid him for building a deck and pantry.  Because Borrson performed services in furtherance of Weeks' business, he was Weeks' employee.  The Director concluded that Weeks did not present "substantial evidence to deny coverage or to rebut the presumption that [Borrson] suffered a compensable injury to the left arm."

Weeks appealed.  See HRS § 386-73.  The Labor and Industrial Relations Appeals Board (LIRAB) in a 2-1 split reversed the Director.

The LIRAB majority found that Weeks and Borrson had no employment relationship under either HRS § 386-73.5's (1) control or (2) relative nature of work test.  LIRAB's chair dissented.

LIRAB concluded that Weeks overcame the presumption of coverage under the control test.  It reasoned that Weeks did not have "the absolute power" to dictate the means and methods of Borrson's work.  It also found that Borrson performed the work

5

according to his methods because he had long-time experience as a journeyman carpenter. As for the roofing project, LIRAB did not find any evidence that Weeks gave Borrson permission to work on the roof before he fell.

Turning to the relative nature of work test, LIRAB concluded that Weeks had again rebutted the presumption of coverage. "[M]aintenance, upkeep and repairs may be integral to Weeks' business." However, "the activity of performing repair or maintenance work," LIRAB remarked, "was not an integral part of Ms. Weeks's rental business." Further, like its control test finding, LIRAB believed that because Borrson had carpentry experience, he had a repair and maintenance business. Thus, LIRAB ruled that Weeks had shown that there was no employment relationship under the relative nature of work test.

Because of the lack of an employment relationship under both HRS § 386-73.5 (2015) tests, LIRAB didn't decide whether Borrson's injury arose out of and in the course of employment.

Borrson appealed.

The Intermediate Court of Appeals (ICA) affirmed in part and vacated in part. The ICA held that LIRAB incorrectly used the preponderance of the evidence standard when it determined that Weeks did not employ Borrson. LIRAB should have used the substantial evidence standard. Thus, the ICA vacated the following Findings of Fact (FOF) and Conclusions of Law (COL):

6

> FOF 19.  Applying the preponderance of the evidence standard, the Board finds that Ms. Weeks met her burden of establishing, under the control test and the relative nature of the work test, that coverage for Claimant's injury is not proper.
>
> COL 1.  The Board concludes that Brenda B. Weeks was not Claimant's employer on September 23, 2015.
>
> COL 2.  The Board concludes that Claimant was not an employee of Brenda B. Weeks on September 23, 2015.
>
> COL 3.  Having concluded that Ms. Weeks was not Claimant's employer and that Claimant was not her employee on September 23, 2015, the Board does not reach the issue of whether Claimant sustained a personal injury involving his left arm on September 23, 2015, arising out of and in the course of employment.

In its remand instruction, the ICA directed LIRAB to apply the substantial evidence standard "to the analysis under HRS § 386-73.5."

The ICA also vacated FOF 12 in its entirety.  FOF 12 reads: "The Board credits Ms. Weeks's testimony that [Borrson] did not have her permission to perform work on the roof on September 23, 2015.  There is no evidence – not even [Borrson's] own testimony – that it was done at her request or that he received her prior authorization."  LIRAB clearly erred, the ICA concluded, because Borrson testified that Weeks told him to work on the roof.  On remand, the ICA instructed: "LIRAB remains free to credit the testimony of Weeks and not Borrson, or vice versa."

Last, the ICA agreed with LIRAB that Weeks reasonably argued that she did not employ Borrson, so she was not liable for Borrson's fees and costs under HRS § 386-93(a) (2015).

7

Borrson appealed again. His cert application challenges LIRAB's findings and conclusions that Weeks produced evidence to rebut HRS § 386-73.5's presumption that she employed him. Borrson argues that both the control test and relative nature of work test support coverage. We accepted cert.

We side with Borrson. Weeks did not present substantial evidence to rebut the presumption of coverage under the relative nature of the work test. Borrson's work was integral to Weeks' home rental business. And Borrson did not have a business of his own. So Weeks was Borrson's employer. Thus, Borrson's injury is covered under Hawai'i's workers' compensation laws.

## II.

First, we discuss the proper evidentiary standard to determine compensability. Next, we assess whether Weeks presented substantial evidence under the relative nature of the work test to overcome the presumption of coverage. Then, we address whether Weeks rebutted the statutory presumption of a covered work injury.

### A. The Substantial Evidence Standard

HRS § 386-85 (2015) is clear-cut. It presumes compensability "in the absence of substantial evidence to the contrary[] . . . [t]hat the claim is for a covered work injury[.]" HRS § 386-85(1). Yet LIRAB applied the

8

preponderance of the evidence standard to find no coverage.  The ICA correctly flagged LIRAB's mistake.

Still, the ICA erred.  It vacated key findings and conclusions and remanded to LIRAB so that it could apply the proper substantial evidence standard.

Remand for this reason was wrong.  The preponderance of evidence standard – the yardstick LIRAB applied - is a higher standard than substantial evidence.  City of Lake Elmo v. Metropolitan Council, 685 N.W.2d 1, 4 (Minn. 2004).  Since Weeks met the higher standard to rebut the presumption of coverage, she met the lower standard.

A party proves something under the preponderance of evidence standard when "the existence of the contested fact is more probable than its nonexistence."  Masaki v. Gen. Motors Corp., 71 Haw. 1, 14, 780 P.2d 566, 574 (1989) (quoting E. Cleary, McCormick on Evidence, § 339, at 957 (3d ed. 1984)).  This court has explained that the party with the burden of proof under the preponderance standard needs to "tip the scale slightly," while the other side need merely keep "the scale evenly balanced."  Iddings v. Mee-Lee, 82 Hawai'i 1, 13, 919 P.2d. 263, 275 (1996).

In contrast, the substantial evidence standard is a lower standard.  "In the workers' compensation context, 'substantial evidence' means 'a high quantum of evidence which, at the

9

minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected.'" Panoke v. Reef Dev. of Hawaii, Inc., 136 Hawai'i 448, 462, 363 P.3d 296, 310 (2015).  The standard requires "evidence [that] a reasonable mind might accept as adequate to support a claim." Acoustic, Insulation & Drywall, Inc. v. Labor and Indus. Rels. Appeal Bd., 51 Haw. 312, 314, 459 P.2d 541, 543 (1969).  Thus, the substantial evidence standard is less exacting and a lower standard than the preponderance of the evidence standard.  See City of Lake Elmo, 685 N.W.2d at 4.

LIRAB held Weeks to the higher preponderance standard. Still under that 50%+ standard, LIRAB found that there was no employment relationship.  If Weeks met the higher preponderance standard to rebut coverage, then she met the lower substantial evidence standard.  Thus, the ICA erred by returning the case to LIRAB so that it could assess the evidence under the substantial evidence standard.

The error though has no dispositive impact.  As discussed next, Weeks did not present substantial evidence to show she was not Borrson's employer.

10

**B.** **Weeks Did Not Present Substantial Evidence Under the Relative Nature of the Work Test to Overcome the Presumption of Coverage**

Hawai'i's workers' compensation laws serve a "broad humanitarian purpose." Van Ness v. State, Dep't of Educ., 131 Hawai'i 545, 558, 319 P.3d 464, 477 (2014). They "create legal liability without relation to fault. They represent a socially enforced bargain: the employee giving up [the] right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries." Id. (quoting Evanson v. Univ. of Haw., 52 Haw. 595, 598, 483 P.2d 187, 190 (1971)).

To advance the humanitarian spirit of HRS Chapter 386, the legislature passed laws that presume coverage. First, HRS § 386-73.5 presumes an employment relationship "unless the party seeking exclusion is able to establish under both the control test and the relative nature of the work test that coverage is not appropriate under this chapter." Second, HRS § 386-85(1) presumes "in the absence of substantial evidence to the contrary[] . . . [t]hat the claim is for a covered work injury[.]"

To animate the legislative design behind Hawai'i's workers' compensation laws, our courts and the Labor and Industrial Relations Appeals Board liberally construe those laws to favor a claimant. Potter v. Hawaii Newspaper Agency, 89 Hawai'i 411,

11

423, 974 P.2d 51, 63-64 (1999).  And there's more.  Given the remedial purpose of our state's workers' comp laws, all reasonable doubts are resolved to favor a claimant.  Akamine v. Hawaiian Packing & Crating Co., Ltd., 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972).

There are several definitions that inform workers' compensation claims.  HRS § 386-1 (2015 & Supp. 2016) defines "employee" as "any individual in the employment of another person."  And it defines "employer" as "any person having one or more persons in the person's employment."  HRS § 386-1.  In turn, "employment" means "any service performed by an individual for another person under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into."  Id.  The "employment" definition excludes fourteen service categories.  Id.  For example, certain religious, charitable, educational, and non-profit services, state-subsidized domestic services, and real estate sales services for commission are not considered "employment."  Id.

No "employment" exclusion fits Borrson and Weeks' relationship.  See id.  So Borrson's services are presumed to be covered unless Weeks satisfies two tests.  "Except in cases where services are specifically and expressly excluded from 'employment' under section 386-1, it shall be presumed that coverage applies unless the party seeking exclusion is able to

12

establish under both the control test and the relative nature of the work test that coverage is not appropriate under this chapter."  HRS § 386-73.5.

Last, "wages" is defined as "remuneration for services constituting employment," including "the market value of board, lodging, fuel, and other advantages having a cash value which the employer has paid as a part of the employee's remuneration." Id.

An injury is uncovered unless there's an employer-employee relationship.  Locations, Inc. v. Hawai'i Dep't of Labor and Indus. Rels., 79 Hawai'i 208, 211, 900 P.2d 784, 787 (1995). Hiring an independent contractor does not make a person or business an employer, and thus there is no need to provide workers' compensation coverage for an independent contractor. Id.

Most times an employer-employee relationship is evident. But there are situations, like here, where employment does not seem apparent or intuitive.  Outside the workers' compensation context, few may ascribe an employer-employee relationship to a landlord who reduces rent and pays a tenant to do repair and maintenance work.

HRS § 386-73.5 presumes an employment relationship "unless the party seeking exclusion is able to establish under both the control test and the relative nature of the work test that

13

coverage is not appropriate under this chapter."  HRS § 386-73.5 requires an employer to present substantial evidence under both the control and relative nature of the work test to overcome the presumption of an employer-employee relationship.

Under the control test, employment exists if "the person in whose behalf the work is done has the power, express or implied, to dictate the means and methods by which the work is to be accomplished."  Locations, 79 Hawai'i at 211, 900 P.2d at 787.  A person may be an independent contractor if the "employer" lacks control over their work.  For example, Locations held that real estate agents were independent contractors because, among other things, Locations, Inc. lacked control over the means and methods of the agents' commission-based sales.  Id. at 217-18, 900 P.2d at 793-94.

For the relative nature of the work test, Locations explained, there are two considerations: (1) whether the work is an integral part of the employer's business and (2) whether the worker, in relation to the employer's business, works in a business or profession of their own.  Id. at 212, 900 P.2d at 788.  This court detailed the test's features, but rejected that method to determine an employment relationship.  Id.

The Hawai'i legislature reacted.  The next year the relative nature of the work test became law.  See HRS § 386-73.5.

Weeks must establish there is no coverage under both tests

14

to surmount the presumption of employment.  We look at only one, the relative nature of the work test.

We hold that LIRAB erred in concluding that Weeks proved no employment relationship under that test.  First, Borrson's maintenance, repair, and improvement work was integral to Weeks' home rental business.  Second, he did not have his own maintenance and repair business.

LIRAB found that Weeks operated "a business renting homes." LIRAB also found that "maintenance, upkeep, and repairs may be integral" to Weeks' business.

But then LIRAB made an odd distinction.  It differentiated the necessity of maintenance and repair work and the activity of performing that work: "Ms. Weeks had a residential rental business.  While maintenance, upkeep, and repairs may be integral to such business, the activity of performing such work is not."  Similarly, FOF 18 says:

> Having balanced the factors regarding the general relationship that [Borrson] had with regard to the work performed, the Board finds that the activity of performing repair or maintenance work was not an integral part of Ms. Weeks's rental business, that [Borrson] was in a business of his own, and that the work [Borrson] performed was in his interest over that of Ms. Weeks.

(Emphasis added.)

We believe otherwise.  If repair and maintenance work is integral to a home renting business, then *doing the actual repairing and maintenance* is also integral to the business.  As

15

LIRAB's chair explained in his dissent, "without properly maintained units, Ms. Weeks would not be able to rent out" those living spaces. The chair also reasoned: "In my view, it is undisputable that the maintenance upkeep and/or repair work, is and has always been, an integral part of a home/apartment rental business. Further, in my view, [Borrson] as an experienced journeyman carpenter and/or 'do-all maintenance man,' met Ms. Weeks' needs as a property owner in keeping her rental units maintained and in a livable condition." The dissent continued. "The persuasive evidence is that the integral part of Ms. Weeks' rental business was furthered through the establishment of an 'employment' relationship between Ms. Weeks and [Borrson], where [Borrson] utilized his carpentry, framing, roofing, and plumbing skills to receive 'wages' at $15/hour in the form of cash or check paid by Ms. Weeks."

We agree with LIRAB's chair. Repair and maintenance, as well as the activity of performing such work, is integral to a business that rents homes. Borrson's services, such as fixing a faucet, cleaning drains, repairing water pipes, and replacing broken shelves, ensured that Weeks' rental units remained in livable and rentable condition.

Capital improvements are also integral. LIRAB found that "Weeks specifically requested [Borrson's] assistance on certain projects, for which she paid him by way of rent reductions and

16

reimbursements for materials and supplies."  For these "special projects," Weeks paid Borrson $15 an hour.  She did not reduce his rent.  "If I hired him to do something, I paid him $15 an hour."

Weeks said she paid Borrson for constructing a pantry. Weeks had moved from the main house into the cabin.  She needed a pantry built and asked Borrson to do it.  They agreed that he would do the work, and she would pay him $15 an hour.  Borrson spent at least eight days replacing support beams and siding, framing the walls and doorway, and building the floor.  (The parties disagree as to who installed the drywall.)  Weeks paid by check.  She also paid him to help her construct a closet organizer in that unit.

Weeks described another project to enhance the property. Borrson built "a small deck on the second story that required support from a beam."  Weeks also testified that she paid Borrson to do a "few more" projects but could not remember them.

Improvements are integral to a business that rents homes. The business generates revenue by providing a habitable environment.  See, e.g., Adams v. Workers' Comp. Benefits Guar. Fund, 467 P.3d 1053, 1063 (Alaska 2020) ("repairing a rental apartment's leaky roof presumably benefits the property owner's rental business because a landlord has a duty to 'keep the premises in a fit and habitable condition'").  The business – if

17

it wants to last - must maintain, fix, and improve the living spaces it rents. Capital improvements enhance the rental business' value. A landlord may generate more income by increasing the rental cost to reflect upgrades.

Repair, maintenance, and improvements were integral to Weeks' business.

Borrson's work on the cabin's roof benefitted Weeks' business. Weeks had recently moved from the main house to that unit. New tenants rented the main house. Over the years, Weeks has received revenue from renting all five rental units. Those living spaces comprise Weeks' business inventory. A business owner who rents homes and moves between rentable units doesn't remove those units from the business' inventory.

Weeks may or may not choose to switch units again. Yet regardless of who lives in the unit when it's maintained or repaired, improvements to any structure in Weeks' rental inventory enhances her business' value. A putative employer's personal residence isn't typically part of their business. But we believe there is no personal residence exception to workers' compensation laws for a landlord who lives in one of the rentable - and in this case, previously and recently rented out - units.

The second factor of the relative nature of the work test also favors Borrson. It asks whether the worker, in relation to

the employer's business, is in a business or profession of their own.  LIRAB believed Borrson "was in a business of his own."

LIRAB erred.  True, Borrson worked as a journeyman carpenter for decades.  However, he wasn't in the maintenance and repair business when he fell off the ladder.  He worked at Air Service Hawaii refueling jets and loading baggage.  The second sentence of LIRAB's FOF 17 found that Borrson "was in the business of repair and maintenance work and performed work for Ms. Weeks in furtherance of such business."  That's clearly erroneous.

There was no evidence that Borrson had a separate business doing repair and maintenance work at the time of his fall.  Rather, he worked full time for Air Service Hawaii.  Borrson's job had no relation to Weeks' business of renting homes, or any business that needed repair and maintenance work.  He had worked as a carpenter, but he no longer held himself out to the public as a person for hire.  Only one business contracted for his services.  Borrson's work was done in furtherance of Weeks' business.  Not his business - he didn't have one.  Borrson's employment relationship with Weeks existed as a result of, and to benefit, Weeks' business of renting homes.  No evidence in the record supports the second sentence of FOF 17.

Both relative nature of the work factors favor Borrson.  Borrson's repair, maintenance, and improvement work was integral

to Weeks' business of renting homes. And he did not have a related business himself. The relative nature of the work test supports Borrson's position that Weeks employed him. LIRAB erred in holding that Weeks proved under the relative nature of the work test that coverage for Borrson's injury was improper. Rather, an employment relationship existed.

LIRAB's FOFs 17-19 and COLs 1-4 determined that there was no employer-employee relationship. Therefore, we vacate those findings and conclusions.

> 17. . . . The Board finds that [Borrson] was in the business of repair and maintenance work and performed work for Ms. Weeks in furtherance of such business.
>
> 18. Having balanced the factors regarding the general relationship that [Borrson] had with regard to the work performed, the Board finds that the activity of performing repair or maintenance work was not an integral part of Ms. Weeks's rental business, that [Borrson] was in a business of his own, and that the work [Borrson] performed was in his interest over that of Ms. Weeks.
>
> 19. Applying the preponderance of the evidence standard, the Board finds that Ms. Weeks met her burden of establishing, under the control test and relative nature of the work test, that coverage for [Borrson's] injury is not proper.
>
> . . . .
>
> 1. The Board concludes that Brenda B. Weeks was not [Borrson's] employer on September 23, 2015.
>
> 2. The Board concludes that [Borrson] was not an employee of Brenda B. Weeks on September 23, 2015.
>
> 3. Having concluded that Ms. Weeks was not [Borrson's] employer and that [Borrson] was not her employee on September 23, 2015, the Board does not reach the issue of whether [Borrson] sustained a personal injury involving his left arm on September 23, 2015, arising out of and in the course of employment.
>
> 4. The Board concludes that Brenda B. Weeks is not

20

> liable for [Borrson's] fees and costs pursuant to Section 386-93(a), HRS.

We conclude that under the relative nature of the work test, Weeks did not rebut the presumption that she and Borrson had an employer-employee relationship. Because repair, maintenance, and improvement work are integral to Weeks' business, and Borrson did not then have a business of his own, HRS § 386-73.5 supports an employment relationship between the two.

To win, Weeks must have established that Borrson was not an employee under *both* the control and relative nature of work tests. HRS § 386-73.5. Since she failed to do so under the relative nature of work, we need not address the control test.

C. **Weeks Did Not Overcome the Presumption of a Covered Work Injury**

If a person gets injured while working, they may bring a workers' compensation claim. That claim is presumed to involve "a covered work injury" unless there is "substantial evidence to the contrary[.]" HRS § 386-85 (2015).

To rebut the presumption that a claim concerns a covered work injury, an employer has the burden of production, as well as the burden of persuasion. <u>Van Ness</u>, 131 Hawai'i at 558, 319 P.3d at 477. The employer must present substantial evidence that the injury is unrelated to work. <u>Akamine</u>, 53 Haw. at 408, 495 P.2d at 1165-66. If the employer cannot produce substantial

21

evidence, "the presumption mandates that the claimant must prevail." Id. at 409, 495 P.2d at 1166.

Since Weeks was Borrson's employer, the question becomes whether she produced substantial evidence to overcome the presumption that Borrson's injury was work-related. At the time Borrson fell, he was installing tin metal panels on the roof of Weeks' unit. The ladder he was on buckled and he fell about six feet. Borrson sustained a "mid shaft humerous fracture" to his left arm.

Weeks' only argument to combat section 386-85's presumption of a work-covered injury was that she did not give Borrson permission to work on the roof. LIRAB agreed. "The Board credits Ms. Weeks's testimony that [Borrson] did not have her permission to perform work on the roof on September 23, 2015. There is no evidence – not even [Borrson's] own testimony – that it was done at her request or that he received her prior authorization."

The ICA held this finding clearly erroneous based on the second sentence because Borrson testified that Weeks told him to work on the roof. We agree with the ICA that FOF 12 is clearly erroneous. Unlike the ICA, though, we conclude that we do not need to remand to LIRAB for a credibility determination on "approval."

22

Even if the finding remained, LIRAB's credibility determination in the first sentence does not foreclose a favorable decision for Borrson. Under the relative nature of the work test, Weeks' approval, or non-approval, is insignificant. The relative nature of the work test concerns the actual work performed. Here, installing tin metal roof panels constitutes repair, maintenance, and improvement work that was integral to Weeks' business.

Further, the statutory presumption of an employment relationship overrides anything written in the Yard Maintenance Agreement. The agreement said that Borrson would only get paid for "agreed upon" work. This, however, does not determine whether an employment relationship existed. HRS § 386-73.5 elevates the control and relative nature of work tests as the only determinants. When applying the latter test, we focus on the worker's actual services. Here, while Weeks' limitation in the agreement may speak to Weeks' control or whether tasks completed were integral to her rental business, it does not overcome the presumption of an employment relationship.

Neither the LIRAB majority nor the minority halted their inquiry because the Yard Maintenance Agreement and HRS § 386-1's definition of "employment" transcend the statutory tests. Rather, like the Director before them, the three members relied on HRS § 386-73.5 to resolve the case.

23

After FOF 12, the clearly erroneous finding that Borrson "did not have her permission to perform work on the roof," LIRAB made a finding necessary to the control test. FOF 13 said that Weeks did "not have the absolute power to dictate the means and methods by which the work was to be accomplished."

Then, LIRAB's next five FOFs covered the relative nature of the work test. Weeks "had a business renting homes," Borrson's work was "not integral to [Weeks'] business renting homes," and Borrson "previously worked as a journeyman carpenter and used his professional knowledge in performing such work." After that, LIRAB found, Borrson "was in the business of repair and maintenance work and performed work for Ms. Weeks in furtherance of such business," and "the activity of performing repair or maintenance work was not an integral part of Ms. Weeks' rental business, . . . Claimant was in a business of his own, and . . . the work Claimant performed was in his interest over that of Ms. Weeks."

Like LIRAB, we believe the tests are dispositive. See HRS § 386-73.5. Sure, a "contract of hire" is an inquiry because there must have been a service performed based on an "express or implied, oral or written" contract. See HRS § 386-1. But the terms or scope of that contract – whether the work performed constitutes *covered* employment – is subject to the two-test inquiry. Our decision does not "re-write" the Yard Maintenance

24

Agreement.  Instead, because employers can't contract around the statutory tests and presumption of an employment relationship, it preserves the rights of injured workers.

Evidence of a contract does not displace the employment relationship and coverage analysis prescribed by the legislature.  While "authorization" results in coverage, (as LIRAB's majority and minority understood), "no authorization" (as LIRAB's members, by applying the tests, also understood), does not end an injured worker's case.  Otherwise, there would be no need for HRS § 386-73.5's tests.  We believe the control test and relative nature of the work test operate to preserve an injured worker's right to compensation and are not sidelined by tangled issues relating to a putative employer's contract language.  See Locations, 79 Hawaiʻi at 211-12, 900 P.2d at 787-88.

Hawaiʻi law advances the dignity of Hawaiʻi's workforce.  A person in Hawaiʻi who gets injured doing work that comprises an integral part of another's business should receive compensation unless that person has a business of their own doing that type of work.  HRS § 386-73.5's relative nature of the work test quashes quarrels about the scope and nuances of the work the injured person performed.  There is no "I-didn't-say-you-could-do-that" armor to block compensation for an injured worker.

25

A worry that an "anytime there was an 'employment' relationship, the employee could engage in any type of 'service' – even outside the 'contract of hire' – and be covered for workers' compensation if injured" seems misfocused. That's the business' problem. HRS Chapter 386 ensures that workers are compensated when they suffer injuries while furthering a business' interests. If work integral to a business is needed, then it is prudent for that business to hire a properly insured business, independent contractor, or person. The remedial character and "beneficent purposes" of Chapter 386 protect Hawai'i's workers. Flor v. Holguin, 94 Hawai'i 70, 79, 9 P.3d 382, 391 (2000) (citing Evanson, 52 Haw. at 600, 483 P.2d at 191). Businesses are protected too. When an "employee" performs non-integral work, or acts outside of the control of the "employer," the two tests do not consider that person a covered employee. See HRS § 386-73.5.

Weeks and Borrson had an employer-employee relationship. For purposes of Chapter 386, Borrson's duties included repair, maintenance, and improvements. The issue thus becomes whether installing roof panels constituted repair, maintenance, and improvement work that was integral to Weeks' business. We hold that installing tin metal roof panels fits those categories. The roof service improved Weeks' business. We conclude that

Borrson suffered a compensable injury while working on Weeks' roof.

## D. Weeks is Not Responsible for Borrson's Attorney Fees and Costs

Last, Borrson argues that Weeks acted unreasonably when she argued she was not his employer. Therefore, under HRS § 386-93(a), she should pay his fees.

LIRAB found that Weeks' position was not so unreasonable to justify attorney fees.

> 20. Given the circumstances of this case, it was reasonable for Ms. Weeks to present the issue of [Borrson's] employment status to the Director for determination.
>
> 21. The Board finds that [Borrson] has not met his burden of proving that Ms. Weeks proceeded without reasonable grounds.

The ICA agreed. And so do we. Borrson must pay his own attorney fees and costs.

## III.

We vacate LIRAB's July 3, 2019 decision and order. We also vacate the ICA's July 5, 2024 judgment on appeal. Weeks must compensate Borrson and provide workers' compensation benefits pursuant to HRS Chapter 386. We remand to LIRAB to compute compensation.

| | |
|---|---|
| Wayne H. Mukaida<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Todd W. Eddins |
| W. Anthony Aguinaldo<br>(on the briefs)<br>for respondent | /s/ Vladimir P. Devens |

